Christian, J.
This is an appeal from a decree of the late District court of the 6th Judicial District, affirming a decree of the Circuit court' of Frederick county.
The following facts disclosed by the record, are necessary to be adverted to in order fairly to present the question this court is now called upon to consider.
Col. Wm. B. Yancey, of the county of Rockingham, departed this life in the year 1858, leaving a large real estate. After his death several suits were brought, having for their object the sale of his real estate, for the payment of his debts and the partition of the surplus among his heirs at law. It is not necessary to notice the proceedings in these several suits, (which were after-wards consolidated into one,) except the fact, that on the 3d of June 1860 the Circuit court of Rockingham entered a decree directing a sale of the real estate of which Col. Yancey died seized, and Thomas L. and Wm. B. Yancey were appointed commissioners to sell the same. This decree was not executed until January 1863.
The land at this sale was bid offi by C. A. Yancey, one of the heirs, at $80.50 per acre. The upper part (one-half) was afterwards sold privately to Bernai d P. Teel, at $80 per acre; and Wm. B. Yancey, the commissioner, who made the sale, agreed to take the other half at the same price. This sale was reported to the court, and its confirmation was resisted, upon the ground of inadequacy of price; and much evidence was taken *693 upon that question. The result was, that the court refused to confirm the sale; and by its decree entered on the 25th of May 1863 directed that Charles A. Yancey and Joseph R. Logan, who were appointed commissioners for the purpose, should proceed to sell the land theretofore decreed to be sold in these causes, at public or private sale, upon the following terms : One-fourth in sixty days, one-fourth in twelve months, one-fourth in two years, and one-fourth in four years from the day of sale, with interest payable annually from the day of sale, taking from the purchaser bonds with good security for the payment, and retaining the title as ultimate security; with the privilege of paying one-half the purchase money upon the confirmation of the sale by the court. This decree was executed on the 7th of August 1863.
At this sale Bernard F. Teel and 'Wm. B. Yancey became the purchasers; Teel purchasing one-half of the home farm (of 457 acres) at $142.00 per acre, and Yancey the other half, at the same price ; the woodland was also purchased by the same parties; one hundred and thirty-seven acres being taken by Teel, for which he agreed to pay the sum of $1,570 ; and one hundred and thirty-eight and a half acres being taken by Yancey, for which he agreed to pay the sum of $1,402.32. This sale was reported to the court and confirmed without objection ; and Teel and Yancey, in accordance with the terms of the decree allowing the purchasers to pay one-half the purchase money upon the confirmation of the sale by the court, accordingly paid down in cash one-half the purchase money, and executed their bonds tor the deferred payments, payable in two and four years from the day of sale.
These bonds fell due after the close of the late war, to wit, on the 7th of August 1865 and the 7th of August 1867.
*694 Suit was instituted by the heirs of Col. Yancey, for' the purpose of subjecting the lands in the hands of the (upon which alien was retained,) to the pay-men£ Qf> ()aiance 0f the purchase money. This claim was resisted upon the ground that the sale of the land was made for Confederate currency, or with reference to said currency as a standard of value; and it was insisted that the bonds due August 1865, and August 1867, should be scaled to their gold value. Numerous depositions were taken tó show the terms of the sale, and the argeement of the parties as to the kind of currency for which the property was sold. And on the 25th July 1868, the Circuit court of Frederick entered its decree, declaring that “ the court is of opinion that the testimony satisfactorily proves that at the sale made on the 7th day of August 1863, pursuant to the decree of May 1863, the deferred instalments of the purchase money were not payable in Confederate States treasury notes, but were payable in current funds; by which was under-stood and intended by the parties to said contract of sale, such funds as might be current at the dates when said instal-ments might fall due ; that is to say, in the events which have occurred, in lawful money of the United States. It is therefore adjudged, ordered and decreed that one of the commissioners of this court ascertain what amount is still owing from the purchasers at said sale, with interest, &e., allowing full credit for the lull nominal amount of the Confederate money paid in cash, &c.
Upon the return of the report under this decree, showing the indebtedness of Vm. B. Yancey, one of the purchasers, to be the sum of seventeen thousand five hundred and forty-five dollars and seventy-one cents, and of the other purchaser, Bernard P. Teel, the sum of seventeen thousand six hundred and twenty-nine dollars and seventy-five cents, the court decreed against them and *695 ' their sureties, the payment of there several amounts; and further decreed that “ if they and their sureties shall fail to pay the said sums of money respectively, within sixty days from the date of this decree, then Charles A. Yancey, who is appointed a commi sioner for that purpose, shall proceed to sell to the highest bidder, on the premises, so much land as may be necessary to pay what is due from each defaulting vendee upon his said purchase, upon the following terms, > iz : one-fourth of the purchase money in cash, the residue in equal sums of nine, eighteen and twenty-seven months from the day of sale ; all to bear interest from the day of sale, and to he secured by deed of trust on the land.”
To these decrees an appeal was allowed to the District court at 'Winchester. On the 3d of December 1869, that court affirmed the decrees of the Circuit court of Frederick: and an appeal was allowed from the decree of the District court to this court.
In the petition of appeal to the District court and to this court there are several errors assigned, and relied upon, in argument here, which I will now proceed to notice.
As to the first error suggested in the petition for appeal to this court, to wit: that the District court had no jurisdiction “to hear the cause or make any decree therein,” it is sufficient to refer to the act of Assembly approved March 5th, 1870, commonly called the “Enaabling Act,” and the construction of that act by this court in the case of Griffin’s ex’or v. Cunningham, 20 Gratt. 31.
If the District courts were not continued by the operation of the schedule, their acts were declared legal and binding by the act referred to; and that act was declared by this court, to be valid ; except the proviso which gave this court the authority to rehear and review causes *696 decided by the court of appeals, organized under the reconstruction acts; the majority of the court holding that the Legislature had no authority to confer such power upon this court, and that the proviso was in this respect void. But in all other respects the statute was held by all the judges of this court, to be constitutional, valid and binding. The question raised is therefore res adjudicóla, and no longer open for discussion.
Another error assigned, is, that the Circuit court of Bockingham ought to have confirmed the sale made by !Wm. B. Yancey, surviving commissioner, on the 13th of January 1863. That sale was excepted to, 1st: Because the land was sacrificed at private sale. 2d: Because ¥m. B. Yancey, the commissioner, was interested in the purchase of the lower tract. 3d: Because an advance upon the price was offered by Mr. Price. And 4th: Because there was no memorandum of the sale.
The Circuit court sustained these exceptions, and set aside the sale. There was no error in that decree. It is manifest from the evidence taken upon the exceptions to the sale, that persons were prevented from attending the sale, in consequence of the prevailing impression that no sale would take place at the time advei’tised; which was based upon the cui’rent report that the widow would not consent and unite in the sale. The doubt and uncertainty as to whether the widow’s dower would be sold with the land, manifestly affected the price ($80 per acre).for which it was sold; several witnesses stating that the land would have brought $100.00 per acre, if it had been ascertained that the widow was. willing to unite in the sale; and one witness,Geo. W.Price, (whose responsibility was not questioned,) binding himself to bid at the start $90 per acre, if the land should be put up again. It was also shown that one-half of the land was bought by the commissioner, ¥m. B. Yancey, who *697 made the sale. Under these circumstances, the Circuit court very properly set aside the sale, or rather refused to confirm it, and directed another sale to be made.
Another alleged error, is the appointment of Charles A. Yancey, as commissioner to make the second sale, who was one of the plaintiffs in the suit, in his own right and as adminstrator de bonis non of his father, ¥m. B. Yancey, as trustee of one of the .other parties interested, and as next friend of certain infants.
There was nothing in these relations which disqualified him as a commissioner to do the behests of the court. In fact a commissioner is but the agent of the court. A salé by a commissioner is a sale by the court; his acts are subject to the control and superintendence of the court, and are liable to exception by any person interested; aúd, indeed, there is no sale without the approval of the court. The fact that Charles A. Yancey was one of the plaintiffs does not affect the validity of the sale.
Under the English practice in chancery proceedings, the conduct of the sales is usually , given to the plaintiff, or other party having the charge of the general proceedings. (See 2 Dan. Ch. Pr. 1267.) Nor is there any thing in the rules of chancery practice in our courts, which forbids such appointment. The commissioner is the officer of the court, and acts under its supervision. His errors, when brought to the notice of the court, or when appearing on the face of the proceedings, will be corrected.
It is no where proved, or even charged, that the conduct of the commissioner was not perfectly fair and impartial. No objection was made to the commissioner in the court below, nor was the court asked to substitute another; nor was' the sale objected to on account of the commissioner being a party to the suit. The *698 objection is made for the first time in this court, and comes too late, even if it could have availed the party in the court Jbelow. See Goddin v. Vaughan’s ex’x, 14 Gratt. 102, Roberts v. Roberts, 13 Gratt. 639.
The remaining assignment of error, and the one mainly relied upon by the counsel for the appellants, is that the court below erred in decreeing that the deferred instalments of the purchase money for the land sold pursuant to ahe decree of May 1863, “ were not payable in Confederate States treasury notes,” but “in such funds as might be current at the dates when said instalments might fall due;” and in decreeing against the appellants’ payment of these sums in the present currency.
It is insisted for the appellants, that the sale was made for Confederate currency, or with reference to said currency as a standard of value ; and that therefore the instalments falling due in 1865 and 1867 ought to be scaled. They rely in their answers, mainly upon the fact that the land sold for so large a price, $142.50, as to preclude the idea that it was sold for any other than depreciated Confederate currency. Teel says, “ the prices at which these lands sold show that the payments were to be made in current' funds, or Confederate money, and that currency was the standard of value in the contemplation of the parties.”
Price, who was the purchaser from ¥m. B. Yancey, of his part of the purchase at the sale, says in his answer: “ The price was so far above the regular value of the property in any other currency as to preclude the idea of any other standard of value.” They both insist that the deferred payments should be scaled. It is a noteworthy fact that neither of the defendants make any reference to what occurred at the sale as to the terms upon which the land was sold as announced by the commissioner and auctioneer, but rely entirely upon the pré' *699 sumptions arising from the price agreed to be paid for the land, as fixing the standard of value with reference to which they purchased.
Before referring to the evidence in the record; which ° is clear and uneontradicted, it may be observed that the mere fact that the land brought nearly double its value in gold, is not of itself a conclusive presumption under the circumstances of this case, that the sale was made for Confederate currency, or with reference to such currency as a standard of value. It must be remembered that the real value of the land is fixed at 75 or 80 dollars per acre, that it was assessed before the war at $80 per acre. The purchaser had the privilege of paying down in cash one-half of the purchase money, and the balance was to be paid in two and four years. The home farm, 457 acres, sold for $67,379 00. Half of this amount, $33,689.50, the purchaser could, if he chose, pay in Confederate currency, worth $2,406.32 in gold. With this privilege he could get one-half the land at from five to six dollars an acre, which was worth from $75 to $80 per acre. He might therefore, be perfectly willing to take the risk of paying for the other half in a sound currency. But the risk was a small one at best; for if re> quired to pay the balance of the purchase money in gold it would not be more or very little more than the value' of the land. On the other hand, he had the chance, and not a remote one, of paying the whole in a depreciated currency. Indeed, if the war had lasted four months longer, one-fourth more of the purchase money would have been received in a still more depreciated and nearly worthless currency. It, therefore, by no means follows, that the large price for which the land sold, furnishes a conclusive presumption that it was sold for Confederate currency when it was sold upon such long credit,'and ^he purchaser had the privilege of paying for one-half in *700 The presumpa currency depreciated fourteen to one. tion is rather in favour of taking the risk of paying the deferred instalments in a sound currency, especially when there was every thing to gain, and nothing to lose.
But in this case we are not left to presumptions arising upon isolated facts : but we have clear, distinct, and uncontradicted proof of the terms upon which the land was sold by. the commissioner and purchased by the appellants. Seven witnesses were examined, among them the commissioner who made the sale and the auctioner. who cried oft' the land. They all concur in the statement, that the terms were publicly announced, and that these terms were, that one-half of the purchase money would be received in cash when the sale was confirmed, and the other half to be paid in two and four years from the day of sale, in the currency which might be in circulation at the maturity of the deferred payments.
Mr. Logan, one of the commissioners who made the sale, says: “The notes were drawn payable in one, two, three and four years; payable in current fundi; the purchaser having the privilege of paying the two first payments upon a confirmation of the sale; the two deferred bonds to be paid in the currency at the time they fell due.” “ I recollect distinctly announcing the the terms myself” .“I announced it to the crowd for the benefit of all concerned.” In answer to the question: “ You state the deferred bonds were to be paid in the currency of the country at the time they fell due: Explain whether you mean the currency of the country, wrhich existed at the date of the sale, or the currency which should exist when the bonds matured.” Answered : “ The currency which should exist at the maturity of the bonds ; that was my understanding.”
Mr. Bowman, the auctioneer, states: “ It has been *701 my habit to am.ounce the terms of any sale previous to its commencement. I think I did in this case, but am not certain ■ I recollect also that Mr. Logan announced the terms of the sale too, but at what particular time, whether at the commencement or after the bidding had begun, I cau’t sáy; I think it was after the bidding begun. There was some difficulty or contention as to the manner of the payments, and Mr. Logan got upon the block, and announced the conditions. I went there, in the first place, not as an auctioneer but as a bidder, with the cletei’mination to buy the property. I was employed after I got there” to cry thes ale, and announced to them thatl intended to bid. I did bid upon the property to a certain amount, and declined bidding iurther on account of the- conditions of the sale, for this reason : As I understood the conditions, whatever was the currency of the country when the bonds matured, would have to be paid; and I was very apprehensive that Confederate money would not be the currency then.” He further states, that his last bid was $>142.25, and that there were several bids afterwards.
Five other witnesses who were present at the sale, concur in stating that it was distinctly announced by the commissioner making the sale, that the deferred payments were to be made in whatever might be the currency in circulation when these payments became due. Hot one of these witnesses is contradicted; nor can a witness be produced who was present at the sale, who will say that the terms were different, or that they were not announced as stated by these witnesses, on the day of sale. It is a pregnant fact, that neither of the purchasers are examined as witnesses to prove that they did not so understand the terms of sale; and in their answers, neither say one word on the subject, but rely *702 exclusively on the large price bid as affording a presumption that the sale was for Confederate money.
I have already shown, that without looking to the evidence in the cause, this presumption would by no means be a conclusive one. But if it could be raised, is entirely overcome by the undisputed facts in the cause. There is still another fact which, standing alone, would go far to show conclusively that the whole of the purchase money was not to be received in Confederate money, but the deferred payments in such currency as might be in circulation at their maturity; and that is the fact that two hundred dollars per acre was actually offered in Confederate money, and was refused.
The witness, Gibbens, says: “ I was offered that day (the day of sale) $200 per acre, if I would purchase and agree to take the responsibility of the deferred payments.”
Mr. Logan Says: “ I was offered privately $200 per acre for the land, by Mr. Branch, of Petersburg.”
I am of opinion that it is conclusively shown by the evidence, of which there is no conflict, that the true understanding and agreement of the purchasers, that the bonds maturing on the 7th of August 1865, and the 7th of August 1867, should be paid in the present currency, that being the currency in circulation when the bonds fell due; and that in accordance with the principles settled by this court in Boulware v. Newton, 18 Gratt. 708; Kraker v. Shields, 20 Gratt. 379; and Morgan's adm'x v. Otey, 21 Gratt. 619, the decree of the District court should be affirmed. .
I am the more satisfied with this conclusion, not only because it is based upon well settled principles, which must now be regarded as firmly settled by this court, but because it meets all the equities of the case. If it were possible to regard the sale in this case as a sale in *703 full for Confederate money, and scale the payments, then the purchasers would, be confirmed in their title to this real estate, for the most part the property of infants, who are the special subjects of, protection in a court of chancei’y, by paying the paltry sum of between five and six thousand dollars, when the land is shown by all the evidence, to be worth over thirty-four thousand dollars. On the other hand, when the appellants pay the amount decreed against them, they will pay not more than the real value of the land. I am not disposed, therefore, to disturb that decree, and think it ought to be affirmed.
Moncure, P., and Staples, J., concurred in the opinion of Christian, J.
Anderson and Bouldin, Js. dissented.
Decree appirmed.